# In the United States Court of Federal Claims

No. 08-680 C

(E-Filed under seal: October 8, 2008)[1]
(E-Filed for publication: October 14, 2008)

_____  )
                                           )
E-MANAGEMENT CONSULTANTS, INC.,            )
                                           )
                     Plaintiff,            )        Post-Award Bid Protest; Motion
                                           )        for Injunctive and Declaratory
v.                                         )        Relief; Whether Agency Issued
                                           )        Override of Automatic Stay in
THE UNITED STATES,                         )        Accordance With CICA; 31
                                           )        U.S.C. § 3553(d)(3)(C).
                     Defendant,            )
                                           )
and                                        )
                                           )
CENTECH GROUP, INC.,                       )
                                           )
                     Defendant-Intervenor. )
                                           )
_____  )

Jason P. Matechak, Washington, DC, for plaintiff.  Lawrence S. Sher and Keith D.
Coleman, Washington DC, of counsel.

David A. Harrington, with whom were Gregory G. Katsas, Assistant Attorney General,
Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director, Commercial
Litigation Branch, Civil Division, United States Department of Justice, Washington, DC,
for defendant.  Timothy H. Goodman and Zachary S. Dunlap, Office of the Chief
Counsel, National Highway Traffic Safety Administration, Washington DC, of counsel.

--------------------------------------------------

[1]When this opinion was e-filed under seal on October 8, 2008, the court afforded the
opportunity to "any party [who] believes that this Opinion contains protected material that should
be redacted before publication," to request, by motion, that such protected material be redacted.
None of the parties requested a redaction.

Kenneth A. Martin, McLean, VA, for defendant-intervenor.

OPINION AND ORDER

HEWITT, Judge

The court has before it Plaintiff's Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and Declaratory Relief (plaintiff's Motion or Pl.'s Mot.), filed September 25, 2008, plaintiff's Memorandum in Support of Plaintiff's Emergency Motion for Declaratory Relief, Temporary Restraining Order, and Preliminary Injunction (plaintiff's Memorandum or Pl.'s Mem.), filed September 25, 2008, Defendant's Response in Opposition to Plaintiff's Motion for Declaratory and Injunctive Relief (defendant's Response or Def.'s Resp.),[2] filed October 1, 2008, Plaintiff's Memorandum in Reply to Defendant's Opposition to Plaintiff's Motion for Declaratory and Injunctive Relief (plaintiff's Reply or Pl.'s Rep.), filed October 2, 2008, Defendant's Motion to for [sic] Leave to Supplement the Administrative Record (defendant's Motion or Def.'s Mot.), filed October 3, 2008, and Plaintiff e-Management Consultants, Inc.'s Response in Opposition to Defendant United States' Motion for Leave to Supplement the Administrative Record (plaintiff's Response or Pl.'s Resp.), filed October 6, 2008. Centech Group, Inc. (Centech), filed a motion to intervene (Centech's Motion) on September 30, 2008, and the court granted Centech's Motion on October 1, 2008.[3]  Order of Oct. 1, 2008 (Docket Number 11).  The Administrative Record (AR) in this case was filed on October 1, 2008.

Plaintiff's Motion challenges the action of the United States acting through the National Highway Traffic Safety Administration, an agency within the Department of Transportation (NHTSA, defendant, or the government).

On Thursday, October 2, 2008, the court held an oral argument on the merits of plaintiff's Motion.  On Friday, October 3, 2008, the court received declarations by NHTSA officials as proposed supplements to the AR.  Def.'s Mot. 1.  The court

---

[2]Attached to Defendant's Response in Opposition to Plaintiff's Motion for Declaratory and Injunctive Relief (defendant's Response or Def.'s Resp.) were four declarations of National Highway Traffic Safety Administration (NHTSA) employees.  The court did not rely on those declarations in this opinion.

[3]Centech Group, Inc. (Centech) appeared at and participated in oral argument on Thursday, October 2, 2008, and appeared telephonically and participated in oral argument on Monday, October 6, 2008, but has not filed briefing on the merits.

conducted an informal telephonic status conference with the parties on Monday morning, October 6, 2008, and an oral argument on the merits of defendant's Motion on Monday afternoon, October 6, 2008.[4]  For the following reasons, plaintiff's Motion, to the extent it seeks declaratory judgment, is GRANTED.

I.      Introduction and Factual Background

        A.      Procedural History

        On July 2, 2008, NHTSA issued Request for Proposals No. DTNH22-08-R-00179 (the Solicitation) to procure information technology (IT) services.  Pl.'s Mem. 2.[5]  Both plaintiff, e-Management Consultants, Inc., and defendant-intervenor, Centech, submitted proposals.  See id.  On the date of the Solicitation and continuing until September 30, 2008, plaintiff, as the incumbent contractor, was under contract to perform IT services for NHTSA.[6]  Id. at 2, 5.  On September 11, 2008, plaintiff was notified by NHTSA that the contract under the Solicitation (the contract) had been awarded to Centech.  Id. at 2. Centech began performance of the contract on September 15, 2008.  Def.'s Resp. 4.  On September 16, 2008, plaintiff timely filed a protest with the Government Accountability Office (GAO), Pl.'s Mem. 2, Ex. C (Bid Protest Letter of e-Management Consultants, Inc.) 1, which is proceeding at GAO as case number B-400585, Pl.'s Mem. 2, Ex. D (GAO Acknowledgment of Protest B-400585) 1.  GAO will issue its decision on the merits of the bid protest case on or before December 26, 2008.  Pl.'s Mem., Ex. D at 2.

        B.      Override by NHTSA

        The Competition in Contracting Act of 1984 (CICA), Pub. L. No. 98-369, § 2741(a), 98 Stat. 494, 1175 (codified as amended at 31 U.S.C. § 3551–56 (2006)), provides for an automatic stay that prevents an agency from proceeding with a protested

---

        [4]The court DENIES Defendant's Motion to for [sic] Leave to Supplement the Administrative Record (defendant's Motion or Def.'s Mot.) for the reasons stated in Appendix A of this Opinion.

        [5]Background facts cited to the filings of only one of the parties do not appear to be in dispute.

        [6]Plaintiff performed pursuant to Solicitation No. GS-06F-0081Z and a follow-on contract issued on June 1, 2007.  Plaintiff's Memorandum in Support of Plaintiff's Emergency Motion for Declaratory Relief, Temporary Restraining Order, and Preliminary Injunction (plaintiff's Memorandum or Pl.'s Mem.) 2.

contract provided that the agency is timely (that is, within ten days after the date of the contract award or five days after the debriefing date, whichever is later, 31 U.S.C. § 3553(d)(4)) notified of a bid protest, 31 U.S.C. § 3553(d)(3)(A).  Plaintiff timely filed notice with NHTSA on September 16, 2008.  Pl.'s Mem. 3.  GAO notified NHTSA of the protest on September 19, 2008.  Def.'s Mem. 4; see 31 U.S.C. § 3553(b)(1) (requiring GAO to notify the agency "[w]ithin one day after the receipt of a protest").  Under CICA, the "head of the procuring activity" can override the automatic stay if the head of the procuring activity determines that overriding the automatic stay is "in the best interests of the United States" or that "urgent and compelling circumstances [exist] that significantly affect interests of the United States."  31 U.S.C. § 3553(d)(3)(C) (2006).  On September 24, 2008, NHTSA, by Rebecca Pennington, Associate Administrator for Planning, Administrative and Financial Management, issued a written Override Memorandum (OM) that overrode the automatic stay set in place by CICA.  AR 1; see 31 U.S.C. § 3553(d)(3)(C).  In its OM, defendant cited "the best interest[s] of the United States" as its justification.  AR 1; see 31 U.S.C. § 3553(d)(3)(C)(i)(I).

 After receiving notice of the override, plaintiff filed its complaint and plaintiff's Motion in this court on September 25, 2008.  Plaintiff's Verified Complaint for Declaratory and Injunctive Relief (plaintiff's Complaint or Compl.) 1.  Plaintiff seeks review of the override decision contained in the OM only, and not the merits of the underlying bid protest, which plaintiff is continuing to pursue before GAO.  Compl. 1–2.

II.    Legal Standards

    A.    Subject Matter Jurisdiction and Standing

    This court has subject matter jurisdiction over plaintiff's claim.  The question of whether this court has subject matter jurisdiction over a claim is a threshold matter that must be determined at the outset.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998); Pods, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007); see Rules of the United States Court of Federal Claims (RCFC) 12(h)(3).  The Tucker Act, 28 U.S.C. § 1491(b)(1), confers jurisdiction on this court "to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. 1491(b)(1) (2006) (emphasis added).  The propriety of a federal agency's override of an automatic stay pursuant to CICA is reviewable in this court.  RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' [in 28 U.S.C. § 1491(b)(1)] is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction. Section 3553(c)(2)[of CICA] fits comfortably in that broad category."); PGBA, LLC v

United States (PGBA), 57 Fed. Cl. 655, 660 (2003) ("The court simply cannot subscribe to the notion that the same Congress that, as repletely indicated in the legislative history of CICA, sought to bolster the GAO stay and prevent agencies from undercutting the protest review process would then arm agencies with an override option that could easily defeat those purposes–invocable essentially at will and with no judicial review.").

Plaintiff, as an unsuccessful bidder in the procurement action, qualifies as an "interested party" under both the Tucker Act and CICA.  See Banknote Corp. of Am. v. United States (Banknote), 365 F.3d 1345, 1351–52 (Fed. Cir. 2004) (noting that the definition of "interested party," in CICA as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," 31 U.S.C. § 3551(2)(A), also applies to 28 U.S.C. § 1491(b)(1)).  Reviewed in the light of 28 U.S.C. § 1491(b)(1), plaintiff's Motion is properly before the court.

B.      Standard of Review

Plaintiff's Motion seeks a declaratory judgment, a temporary restraining order, a preliminary injunction, and/or a permanent injunction.  Pl.'s Mot. 1, 10.  The court believes that a declaratory judgment issued pursuant to the RCFC 57 is most appropriate in this case.  The court evaluates plaintiff's request for a declaratory judgment under the standard of review directed by the Administrative Disputes Resolution Act, 28 U.S.C. § 1491(b).  See 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in [the Administrative Procedure Act (APA)] section 706 of title 5.").  Section 706 of the APA requires that a court decide whether a federal agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2006).

Under the arbitrary or capricious standard of review, the court may overturn an agency's decision only if the agency's decision lacked a rational basis or involved a violation of regulation or procedure.  Banknote, 365 F.3d at 1351 ("Under the APA standard . . . 'a bid award may be set aside if either[:] (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'") (quoting Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001)); see Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (Motor Vehicle), 463 U.S. 29, 43 (1983).  The test for whether a decision was made on a rational basis is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  Impresa, 238 F.3d at 1332–33 (citation omitted).  "The arbitrary and

capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, Inc. v. United States (Advanced Data), 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citation omitted).  In particular, the reviewing court may not substitute its judgment for that of the agency.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), overruled on unrelated grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977).

Generally, under the APA, the court analyzes whether an agency's decision was "arbitrary and capricious" by considering whether the agency:

> [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4 rendered a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle, 463 U.S. at 43, quoted in Advanced Sys. Dev., Inc. v. United States (Advanced Sys.), 72 Fed. Cl. 25, 30 (2006).  In the CICA override context,[7] this court has sometimes relied on the Motor Vehicle factors.  See, e.g., Advanced Sys., 72 Fed. Cl. at 30.  This court has also identified factors which elaborate the "important aspect[s] of the problem" factor of Motor Vehicle for the CICA context:

> (1) whether significant adverse consequences would occur if the agency did not override the stay (2) whether reasonable alternatives to the override were available, (3) how the benefits of overriding the stay compared to the potential cost of the override, including costs associated with the potential

---

[7]As noted in Superior Helicopter LLC v. United States (Superior Helicopter), "The precedents addressing these considerations deal equally with override determinations made on both 'best interests' and 'urgent and compelling circumstances' bases."  Superior Helicopter, 78 Fed. Cl. 181, 189 n.16 (2007) (citing Reilly's Wholesale Produce v. United States (Reilly's Wholesale), 73 Fed. Cl. 705, 711 n.10 (2006) ("[I]n the court's view, the rationale employed in [best interests] cases has, where indicated, application to the review of an override decision based upon urgent and compelling circumstances.")); Advanced Sys. Dev., Inc. v. United States (Advanced Sys.), 72 Fed. Cl. 25, 31 (2006).  But see Spherix, Inc. v. United States (Spherix), 62 Fed. Cl. 497, 505 (2004) ("Failing the ability to show that urgent and compelling circumstances justify the override, the agency head can elect to make the unremarkable determination that contract performance is in the best interests of the United States.  Presumably, performance of government contracts on schedule always serves the best interests of the United States.").

that the protester might prevail before GAO, and (4) the impact of the
override on the competition and integrity of the procurement system.

Superior Helicopter LLC v. United States (Superior Helicopter), 78 Fed. Cl. 181, 189
(2007) (citing Reilly's Wholesale Produce v. United States (Reilly's Wholesale), 73 Fed.
Cl. 705, 711 (2006) (identifying four factors often considered in the court's override
cases)).

    The court has also identified factors which Congress did not intend for an agency
to consider in the override context.  Reilly's Wholesale, 73 Fed. Cl. at 711 (finding that
some reasons for using the override mechanism are simply inconsistent with the apparent
rationale for the override process and should not be considered).  Importantly, the
government's decision to override the stay cannot be merely that the new contract is
better or that the agency prefers to use the override mechanism instead of seeking
alternative contracting options.  Id.; Advanced Sys., 72 Fed. Cl. at 31 ("The allegation
that the new contract is better than the old one in terms of costs or performance is not
enough to justify a best interests determination.").  "It will almost always be the
expectation that the new contract will be an improvement over the old.  To allow a best
interests determination to rest on such a common ground would permit the override
exception to swallow the Congressionally mandated rule that stays be automatic."
Advanced Sys., 72 Fed. Cl. at 31 (citations omitted).

    In the light of the foregoing, the court evaluates the override decision by NHTSA
by inquiring whether NHTSA considered the relevant factors and whether NHTSA made
a rational decision based on those factors.  See Advanced Data, 216 F.3d at 1058.

    C.    Automatic Stay and Override in Provisions in CICA

    Once notice of a protest has been filed, if authorization for contract performance
has not already been withheld, a federal agency must "direct the contractor to cease
performance under the contract and to suspend any related activities that may result in
additional obligations being incurred by the United States under that contract."  31 U.S.C.
§ 3553(d)(3)(A)(ii).  Performance by the awardee "may not be resumed while the protest
is pending."  Id. § 3553(d)(3)(B).  This is the so-called "automatic stay."  Plaintiff sent
NHTSA timely notice of its protest.  Pl.'s Mem. 3.  GAO notified NHTSA of the protest
on September 19, 2008.  Def.'s Mem. 4; see 31 U.S.C. § 3553(b)(1) (requiring GAO to
notify the agency "[w]ithin one day after the receipt of a protest").  NHTSA issued the
OM on September 24, 2008, thereby lifting the automatic stay and enabling Centech to
resume performance.  See AR 1.

CICA identifies two situations in which the government may override the automatic stay: where "performance of the contract is in the best interests of the United States" or where "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C)(i). Defendant's OM overrode the automatic stay using the "best interests of the United States" prong of 31 U.S.C. § 3553(d)(3)(C)(i). AR 1.

In order fully to identify the relevant factors in an override case, the court considers the objectives behind the automatic stay provision in CICA. See 31 U.S.C. § 3553(d). The automatic stay provision appears to the court to be the keystone that ensures that the various provisions of CICA work to promote competitive contracting. The conference report to the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494, of which CICA was a part, stated that "a strong enforcement mechanism is necessary to insure that the mandate for competition is enforced." H.R. Rep. No. 98-861, at 1435 (1984) (Conf. Rep.). The automatic stay is the enforcement mechanism of the GAO protest scheme. As this court has noted, "The automatic stay is intended to preserve the status quo during the pendency of the protest so that an agency would not cavalierly disregard the GAO's recommendation to cancel the challenged award." Advanced Sys., 72 Fed. Cl. at 30–31 (citation omitted). The automatic stay "preserve[s] competition in contracting and ensure[s] a fair and effective process at the GAO." Id. at 31 (citation omitted). Any override of the automatic stay must be viewed in light of the importance of the automatic stay to the general scheme that Congress enacted in CICA.

A year after CICA was enacted, the United States House of Representatives reiterated the importance of the automatic stay to CICA:

> The act also establishes, for the first time in statute, a strong enforcement mechanism through which contracts are held in abeyance while contractors appeal to the General Accounting Office [now Government Accountability Office] (GAO) when they believe they have been unlawfully denied the opportunity to compete for the award of Government contracts. Congress included these bid protest provisions to help ensure that the mandate for competition would be followed and that vendors wrongly excluded from Federal contracts would receive fair relief.

H.R. Rep. No. 99-138, at 4 (1985) (1985 House Report). The 1985 House Report stated that, "Congress fully recognized that a major deficiency in the existing bid protest process was the inability to stop a contract award or contract performance while a protest was pending." Id. at 4–5. The 1985 House Report further noted:

Agencies, therefore, often proceeded with their contracts, simply ignoring the protest process.  As a result, vendors were confronted with a <u>fait accompli</u> and often did not receive fair and equitable relief even when GAO decided in their favor. . . .

      A key element of the Competition [in Contracting] Act—an automatic stay of contract award or performance pending the Comptroller General's protest decision—was included [in CICA] to preclude such <u>faits accomplis</u> and to facilitate a fair and equitable remedy to vendors who are illegally denied Government contracts.

<u>Id.</u> at 5.

The automatic stay forestalls agency investment in awards subsequently disapproved by GAO.  The importance of the stay mechanism is to avoid circumstances where the agency becomes attached to an awardee later determined by GAO to have been awarded a contract in error.  <u>See id.</u> at 4–5.  The importance of the automatic stay is apparent when it is considered that agencies are not required by law to follow the determinations of GAO in a bid protest, 31 U.S.C. § 3554(b)(1), (3) (stating that GAO only makes recommendations to agencies and requiring an agency that fails to follow a GAO recommendation to make a report to the Comptroller General).  <u>See</u> H.R. Rep. No. 99-138, at 4–5 (pointing out that the automatic stay precludes agencies from continuing with contracts already in performance ("faits accomplis")).

III.    Application of Legal Standards to This Case

The court analyzes whether NHTSA's decision to override was "arbitrary and capricious" by examining NHTSA's OM in the light of the <u>Motor Vehicle</u> factors, as further elaborated by the CICA cases in this court as to the "important aspect[s] of the problem" prong:

      (1) whether significant adverse consequences would occur if the agency did not override the stay (2) whether reasonable alternatives to the override were available, (3) how the benefits of overriding the stay compared to the potential cost of the override, including costs associated with the potential that the protester might prevail before GAO, and (4) the impact of the override on the competition and integrity of the procurement system.

<u>Superior Helicopter</u>, 78 Fed. Cl. at 189 (citing <u>Reilly's Wholesale</u>, 73 Fed. Cl. at 711).

A.     Significant Adverse Consequences

The first factor to consider is whether the agency analyzed "whether significant adverse consequences will necessarily occur if the stay is not overridden." <u>Reilly's Wholesale</u>, 73 Fed. Cl. at 711; <u>see also</u> <u>Chapman Law Firm Co. v. United States</u> (<u>Chapman 2004</u>), 62 Fed. Cl. 464, 468 (2004) (discussing, in a "best interests" case, how the agency's consideration of consequences of abiding by an automatic stay influenced the court's decision).

The OM states that the "purpose of the contract is to provide critical [information technology] services throughout the agency."  AR 1.  These services include maintaining the grants tracking system (GTS) which tracks NHTSA traffic safety grants[8] to states that are worth "hundreds of millions of dollars."  <u>Id.</u>  Without an IT contractor, the OM notes, "the agency has neither the staff nor the requisite expertise to maintain [its IT] systems for several months on its own without outside support," especially considering "fiscal-year-end closeout activities."  <u>Id.</u>  While the court understands that IT is important to maintain these systems, NHTSA failed to address whether, without Centech's services, the "adverse consequences will <u>necessarily</u> occur."  <u>See</u> <u>Reilly's Wholesale</u>, 73 Fed. Cl. at 711 (emphasis added).  The necessity of engaging the awardee is closely related to the second factor:  whether the agency considered reasonable alternatives to overriding the automatic stay.  <u>See</u> <u>id.</u> (noting that the second factor is an alternative way of considering the first factor).  If the agency had reasonable alternatives to engaging the awardee, adverse consequences to the agency's mission would not necessarily result from the stay. Here, NHTSA has shown some possible adverse consequences of not having an IT contractor but, in light of the possible availability of reasonable alternatives, the OM does not support the conclusion that such consequences would <u>necessarily</u> occur if NHTSA did not override the automatic stay.

---

[8]The court notes that NHTSA fulfils an important public policy goal of the United States by its funding of transportation safety grants and that information technology (IT) is an important factor in carrying out the grant program.  <u>See</u> Defendant's Resp., Ex. 4 (noting NHTSA's mission), Ex. 5 (presenting traffic injury and fatality statistics).  However, attaining this goal does not give NHTSA license to disregard federal procurement law, especially those provisions that are designed to ensure fair competition.  <u>See</u> H.R. Rep. No 98-861 at 1435 (1985) (Conf. Rep.) (1985 House Report) ("[A] strong enforcement mechanism is necessary to insure that the mandate for competition is enforced.").

B.      Reasonable Alternatives

The second factor the court evaluates is whether the agency considered "whether reasonable alternatives to the override exist that would adequately address the circumstances presented." Reilly's Wholesale, 73 Fed. Cl. at 711; see also Alion Sci. & Tech. Corp. v. United States (Alison Sci.), 69 Fed. Cl. 14, 27–29 (2005) (discussing reasonable alternatives in a case where the agency used both "best interests" and "urgent and compelling circumstances" to justify an override).

NHTSA claims to have considered a variety of options.  See AR 2.  It claims to have evaluated whether it could forego IT services, extend e-Mangement's contract, or use an "existing procurement vehicle."  AR 2.  As noted in Part III.A, NHTSA concluded it could not forego any IT contractor support.  AR 1 ("[NHTSA] cannot lose its IT systems for that length of time and continue to successfully carry out its mission."); see supra Part III.A (noting that without IT services there could potentially be significant adverse effects on the agency).  It also concluded that it could not extend e-Management's current contract.  AR 2.  NHTSA stated that "absent a waiver" the e-Management contract was capped by the General Services Administration (GSA) at five million dollars, and that amount would have continued the contract only for a few weeks after contract extension.[9]  Id.  Finally, defendant "reviewed other agency contracts" to assess if other existing contracts could fulfil NHTSA's IT needs.  Id.  The OM found that NHTSA did not have any available contracts that would fulfil the needs of the agency. Id.

As to the second option–extending e-Mangement's contract–the court found that information in the AR in this case is not fully consistent with statements in the OM. Compare AR 118–22, 171, with AR 1–3 (the OM).  The AR suggests that NHSTA was ready to abide by the stay and prepared to continue using the existing IT service contractor.  AR 118–22, 171.  The Chief Information Officer (CIO) of NHTSA, Margaret O'Brien, made statements in email pointing to this conclusion, such as, "We could add more funding to ensure coverage for Centech phase-in and/or protest response decision-making. . . . If the current delegation of authority could apply, we could do a mod[ification] for more to cover bringing [e-Mangement employees] and possible others back for 2 or more weeks."  AR 119.  Ms. O'Brien also sent an e-mail stating:

---

[9]The Override Memorandum (OM) also concluded that extending e-Management's contract was not possible because the "the protestor released many of its required personnel, some of which were hired by the awardee."  Administrative Record (AR) 2.  This argument appears to be a red herring.

> E-management is still under contract and could have people here as soon as tomorrow if you so direct them.  If you want us to also to do a mod[ification] to the existing contract to add funds under the current ceiling to carry us to the end of September, please let me know.

AR 121.  In addition to the possible short-term engagement of e-Management, the AR shows that NHTSA also discussed proceeding under Federal Acquisition Regulation (FAR) section 16.505.  AR 118.  Section 16.505 of the FAR includes an option for sole-source contracting "in the interest of economy and efficiency . . . [as] a logical follow-on to an order already issued."  48 C.F.R. § 16.505(b)(2)(iii) (2008).  Ms. O'Brien, on September 23, 2008, wrote:

> I would like to issue a sole source task order under COMMITS for a logical follow-on with e-Management for a period of 6 months.  That period will allow time for the protest to be resolved and also for an orderly phase-in to the awardee.  Centech ha[s] already hired some of the critical staff, such as the lead for infrastructure and web and GTS developers.  They are now without work and could become unavailable altogether.  It is essential that we move as rapidly as possible to get e-Management back on board.

AR 122 (emphasis added).  Mr. Ross Jefferies, a NHTSA contracting official, replied to the CIO stating, "I am considering all available options to the agency including continuing the work with e-[M]anagement in the short term."  AR 171.  The AR does not make clear how and why NHTSA concluded that it could not extend e-Management's contract.

Notes from a meeting with Rebecca Pennington, the official who signed the OM, do not indicate much discussion of the reasoning stated in the OM.  AR 174–78.  The notes indicate that the parties discussed "CICA," AR 174, 175, and the $5 million dollar cap, AR 175, but mention nothing about the substance of the need for an override, AR 174–78.  The notes do not reflect discussion of the options for continuing with e-Management, except for noting the GSA cap, AR 175, and containing the statement "[e-Management] personnel critical task support," AR 178.

The OM says nothing about Ms. O'Brien, the CIO, who, in her September 23, 2008, email, AR 118, suggested that the e-Management contract could be extended under FAR § 16.505(b)(2).  See AR 1–3.  The lack of evidence of a serious exploration of options for obtaining temporary IT services appears to the court to veer close to, if not to reach, NHTSA's "failing to consider an important aspect of the problem."  Motor Vehicle, 463 U.S. at 43.

NHTSA also cannot render findings that "run[] counter to the evidence before [it]." See Advanced Sys., 72 Fed. Cl. at 30 (quoting Motor Vehicle, 463 U.S. at 43). The OM states a conclusion that appears counter to the discussions in the AR. See AR 118–22, 171. The email correspondence in the AR indicates that there may have been reasonable alternatives and NHTSA choose not to pursue them. See AR 118–22, 171. This decision could be considered "arbitrary and capricious." Nevertheless, it is possible that the discussion about alternatives in the OM fits into the "zone of acceptable results" that "requires only that the final decision reached by an agency be the result of a process which 'considers the relevant factors' and is 'within the bounds of reasoned decision-making.'" Reilly's Wholesale, 73 Fed. Cl. at 709 (quoting Balt. Gas & Elec. Co. v. Natural Resources Def. Council, Inc., 462 U.S. 87, 105 (1983)).

   C.    Cost-Benefit Analysis

   The third factor is whether the agency considered "how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs." Reilly's Wholesale, 73 Fed. Cl. at 711; see Superior Helicopter, 78 Fed. Cl. at 189 (noting that the agency must consider "how the benefits of overriding the stay compared to the potential cost of the override, including costs associated with the potential that the protester might prevail before GAO"); see also Chapman 2004, 62 Fed. Cl. at 468 (discussing, in a "best interests" case, how the cost-benefit analysis influenced the court's decision). The court views this factor in light of CICA's legislative history. The legislative history of CICA states that the agencies should consider the costs of GAO's sustaining the protest before it issues an override:

   [T]he head of the procuring activity should consider potential costs to the government from carrying out relief measures as may be recommended by the Comptroller General if the protest is subsequently sustained. This is to insure that if the Comptroller General sustains a protest, such forms of relief as termination, recompetition, or re-award of the contract will be fully considered for recommendation. Agencies in the past have resisted such recommendations on the grounds that the government's best interest would not be served by relief measures of this sort because of the additional expenses involved. [The automatic stay] is designed to preclude that argument in the future, and thus to avoid prejudicing those relief measures in the Comptroller General's review.

H.R. Rep. No. 98-861 at 1436 (Conf. Rep.).

13

The OM's cost-benefit analysis is flawed.  First, the OM identifies the costs of GAO's sustaining the protest as "reprocurement costs."  AR 2.  These are not the only costs of the override.  One additional cost for an agency to consider is the cost to the integrity of the procurement system.  See H.R. Rep. No. 99-138, at 4–5 (1985) (noting the importance of the override); Automation Techs., Inc. v. United States (Automation Techs.), 72 Fed. Cl. 723, 730 (2006) (noting that an agency is "constrained by a consideration of relevant factors, including the ramifications of an agency loss in the GAO protest, and the impact of an override on the competition in contracting and bid protest process, as well as respect for the GAO, an important component in the statutory structure of how to address protests to government procurement actions").

The OM discounts reprocurement costs.  It compares the costs of the override with the costs of continuing e-Management's contract.  AR 2 ("On balance, I believe that the agency has an equal ([though] small) chance of incurring reprocurement costs, whether or not it extends contract performance with the awardee.  Stated another way, extending the protester's performance . . . would not lesson the agency's risk of incurring reprocurement costs.").  The agency concluded that the costs were balanced.  Id.  This is because e-Management was not the "next in line for award" and NHTSA concluded that, if e-Management were successful in its bid protest, then "it would have little choice but to decide to recompete the effort."  Id.

Furthermore, the OM determined that, because NHTSA "has a reasonable chance of prevailing on the merits," the cost of the override was low.  Id.  This is an impermissible consideration.  This type of balancing would allow an agency to employ the very reasoning that CICA sought to prevent.  See H.R. Rep. No. 99-138, at 4–5 (noting the importance of the override in preventing agencies from "ignoring the protest process" and "facilitat[ing] a fair and equitable remedy to vendors who are illegally denied Government contracts").  The government articulated its optimistic view of the likely outcome of the protest to discount the costs of the override.[10]

The OM lists the benefits of overriding the stay as (1) avoiding "termination costs" and (2) "uninterrupted performance beyond the calendar year."  AR 2.  These are not the sorts of benefits envisioned in the cost-benefit calculation.  If, after considering reasonable alternatives, an agency believes that significant adverse consequences will

---

[10]The OM avers that "reinstating performance by the protester would be highly disruptive at this time" and that NHTSA "faces the risk of losing the services of [Centech employees] if our actions lead to another personnel transition."  AR 3.  These arguments may well be reflective of problems of the government's own making.  If the government had pursued alternatives, it could have mitigated this problem.

result if the stay is not overridden, then the "benefit" variable to be used in the calculation is the benefit of <u>avoiding</u> the significant adverse consequences.  <u>See</u> <u>Chapman Law Firm v. United States</u> (<u>Chapman 2005</u>), 67 Fed. Cl. 188, 192 (2005) (noting that without the override the agency would lose three million dollars a month and public property would be subject to vandalism and other threats to public safety); <u>Alion Sci.</u>, 69 Fed. Cl. at 25, 27, 29 (noting the time-critical nature of the contract and the lack of multiple vendors). There has been no showing, as there was in <u>Chapman 2005</u>, 67 Fed. Cl. at 192, that serious adverse consequences will necessarily befall the government in the absence of an override.

> D.   Impact on Competition and the Integrity of the Procurement System

The final factor is whether the agency considered "the impact of the override on competition and the integrity of the procurement system, as reflected in the Competition in Contracting Act." <u>Reilly's Wholesale</u>, 73 Fed. Cl. at 711; <u>see also</u> <u>Automation Techs.</u>, 72 Fed. Cl. at 729–30 (discussing the impact on the procurement system in a "best interests" case).  Defendant claims to have "considered the impact on competition and on the integrity of the procurement process" in the OM.  AR 2.  However, the OM failed to offer any reasoning that shows that it actually considered the integrity of the procurement system Congress created in CICA.  <u>See id.</u> at 2–3.  The text of the paragraphs in which the consideration is mentioned reads in full as follows:

> I considered the impact on competition and on the integrity of the procurement process, should the agency decline to suspend performance.
>
> In my view, the competition process is best served by allowing the awardee to proceed.  As noted above, I conclude from discussions with the relevant agency officials that the agency has a reasonable chance of prevailing. Moreover, the protester is not next in line for award.  Taken together, these two points lead me to conclude that allowing the awardee to proceed is the fairest approach.  As an extra safeguard, however, the awardee's performance will be limited to essential efforts during the pendency of the protest.

<u>Id.</u>

The claimed consideration of the impact on the procurement system do not recognize or vindicate the purpose of the automatic stay.  NHTSA first states that it "has a reasonable chance of prevailing." <u>Id.</u> at 3.  This observation does not relate to the integrity of the procurement system.  It relates to the merits of the protest, not to the

automatic stay in CICA.  NHTSA also states that the protestor is not "next in line."  Id.
Again, this is not an appropriate evaluation of the impact of the override on the
procurement system.  The purpose of the procurement system as envisioned in CICA is a
fair process in which disappointed bidders can seek review at GAO.  GAO was given the
automatic stay in CICA to promote these policies.  See H.R. Rep. No 98-861 at 1435–36
(Conf. Rep.).  NHTSA then states that it has "limited [Centech's performance] to
essential efforts during the pendency of the protest."  AR 3.  Again, this statement has
nothing to do with the integrity of the procurement process.  The CICA stay was meant to
prevent the "fait accompli" of a contractor establishing a relationship in a new contract
with an agency long before GAO issued its decision.  See H.R. Rep. No. 99-138, at 4–5.
Limiting the contractor to "essential efforts," AR 3, does not address Congress' concerns.

The court finds that NHTSA, by failing to consider the impact of its override on
the procurement system, has "failed to consider an important aspect of the problem,"
Motor Vehicle, 463 U.S. at 43, and has, therefore, failed to act rationally and in
accordance with law.  NHTSA's Override Memorandum fails to meet even the deferential
standards of APA review and the court must set aside the override.

IV.     Conclusion

For the foregoing reasons, plaintiff's Motion, to the extent it seeks declaratory
judgment, is GRANTED.  The Clerk of the Court shall enter judgment for plaintiff
declaring that the override by NHTSA of the automatic stay in GAO protest B-400585 is
void and without effect.  All other motions are DENIED as MOOT.

IT IS SO ORDERED.

s/Emily C. Hewitt
EMILY C. HEWITT
Judge

Appendix A

Before the court are Defendant's Motion to for [sic] Leave to Supplement the Administrative Record (defendant's Motion or Def.'s Mot.), filed October 3, 2008, and Plaintiff e-Management Consultants, Inc.'s Response in Opposition to Defendant United States' Motion for Leave to Supplement the Administrative Record (Pl.'s Resp.), filed October 6, 2008.

Defendant's Motion seeks to supplement the Administrative Record (AR) with two declarations from NHTSA officials (Supplemental Declarations).  These Supplemental Declarations purportedly state the facts and circumstances of NHTSA discussions that led to the decision made in the Override Memorandum (OM) discussed, at length, in the main text of this Opinion.  The court DENIES defendant's Motion for the following reasons.

I.      Legal Standards

The court understands that in an override case "the focal point for judicial review should be the administrative record already in existence."  See Camp v. Pitts, 411 U.S. 138, 142 (1973) (discussing judgment on the administrative record).  In limited circumstances, a court may grant a party's request to supplement the administrative record.  See Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989).  In general, the administrative record may be supplemented:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

Id.

Supplementation of the administrative record is appropriate where the record is insufficient for the court to render a decision.  Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1338 (Fed. Cir. 2001) (supplementation

17

of record appropriate where "required for meaningful judicial review"); <u>Portfolio Disposition Mgmt. Group, LLC v. United States</u>, 64 Fed. Cl. 1, 12 (2005) ("We may allow supplementation of the administrative record in limited circumstances where the record is insufficient for the court to render a decision.") (citing <u>Impresa</u>, 238 F.3d at 1338–39). In <u>Impresa</u> the court further stated that supplementation may be allowed if the court needs more information:  (1) to understand if the agency "possessed or obtained information sufficient to decide" the issue or (2) to understand on "what basis" the agency made a decision. <u>Impresa</u>, 238 F.3d at 1339.

Courts have allowed supplementation when the issues are so complex or technical that the supplementary evidence is "evidence without which the court cannot fully understand the issues." <u>Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L.</u>, 56 Fed. Cl. 502, 508 (2003); <u>see</u> <u>Mike Hooks, Inc. v. United States</u>, 39 Fed. Cl. 147, 158 (1997) (supplementation appropriate to aid court in understanding "the highly technical nature of the issues") (citing <u>Esch v. Yeutter</u>, 876 F.2d 976, 991 (D.C. Cir. 1989) (supplementation of administrative record permitted "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly")). This case does not appear to be about a highly technical or complex issue where supplementation would be appropriate for that reason.

II.     Application of Legal Standards

Defendant seeks to supplement the AR with the Supplemental Declarations. Def.'s Mot. 1. Defendant points to <u>Impresa</u>, 238 F.3d at 1339, as authority for supplementing the AR. Def.'s Mot. 3. Defendant claims that the Supplemental Declarations are needed in the AR so the court can decide whether NHTSA "possessed or obtained information sufficient to decide" how to proceed after the automatic stay came into place. Oral Argument of October 6, 2008, argument of Mr. Harrington at 3:45 p.m.–3:55 p.m.; <u>see</u> <u>Impresa</u>, 238 F.3d at 1339. However, the court believes that the information contained in the AR and the OM is sufficient for this court to conduct "meaningful judicial review." <u>Impresa</u>, 238 F.3d at 1338. More particularly, the information contained in the OM and AR are sufficient for this court to decide whether NHTSA's decision was "arbitrary and capricious" under the Administrative Procedure Act standard. <u>See</u> Opinion and Order Part III. The government will almost always be able to supplement the record if the government can claim that additional information is needed to show that an agency possessed "sufficient" information to decide a matter. As long as the administrative record contains enough information for "meaningful judicial review," the administrative record should not be supplemented. <u>See</u> <u>Impresa</u>, 238 F.3d at 1338.

The court agrees with plaintiff that the Supplemental Declarations, prepared after the start of litigation, are written, intentionally or not, with the perspective obtained through "the lens of litigation."  Oral Argument of October 6, 2008, argument of Mr. Sher at 3:19 p.m.–3:22 p.m; see Pl.'s Resp. 6–11.  The OM and AR stand on their own. Accordingly, defendant's Motion is DENIED.